1

2

3

4

5

6

7

8                       **UNITED STATES DISTRICT COURT**

9                        EASTERN DISTRICT OF CALIFORNIA

10

JEREMY LEWIS REAL,
11                                                    Case No. 1:17–cv–01234–SKO
                    Plaintiff,
12
        v.                                            ORDER ON PLAINTIFF'S SOCIAL
13                                                    SECURITY COMPLAINT
    NANCY A. BERRYHILL,
14  Acting Commissioner of Social Security,

15                  Defendant.                        (Doc. 1)

16  _____/

17

18                          **I.   INTRODUCTION**

19          On September 14, 2017, Plaintiff Jeremy Real ("Plaintiff") filed a complaint under 42

20  U.S.C. § 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of

21  Social Security (the "Commissioner" or "Defendant") denying his application for Disability

22  Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits.  (Doc. 1.)  The

23  matter is currently before the Court on the parties' briefs, which were submitted, without oral

24  argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

25                          **II.   BACKGROUND**

26          On July 23, 2012, Plaintiff filed applications for DIB and SSI benefits, alleging that he is

27  unable to work due to carpal tunnel syndrome in both hands, diabetes, and "right knee and foot

28  _____
    [1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

problems." (Administrative Record ("AR") 20, 188–95, 208.) Plaintiff's date last insured was December 31, 2016 and he initially alleged he became disabled on December 15, 2010, but later amended his alleged disability onset date to be September 19, 2015. (AR 20, 67, 208.) Plaintiff was born on May 20, 1975, and was 41 years old on his date last insured. (*See* AR 190.) Plaintiff did not complete high school, and previously worked doing miscellaneous jobs with a temp agency from 1994 to 1997, and as a groundskeeper in 1998, a cashier from 1998 to 1999, a shipping and receiving clerk at an auto warehouse from 1999 to 2005, a parts technician at an auto parts store from 2007 to 2010, and a stocker and cashier from June 2014 to September 2015. (AR 42, 209.)

## A.    Relevant Medical Evidence[2]

### 1.    Fresno Medical Center[3]

Between January and June 2011, Plaintiff visited Fresno Medical Center in Fresno, California eight times for follow up appointments regarding his diabetes, hypertension, hyperlipidemia, sleep apnea, lower back pain, and right heel pain. (AR 516–39.) Plaintiff's treatment notes primarily relate to his diabetes treatment, but the physician or physician's assistant treating him regularly observed Plaintiff to have no signs of acute distress, normal range of motion in his extremities, and no swelling or tenderness in any joints. (AR 516–17, 519–20, 522–23, 525–26, 528–29, 531–32, 535, 538–39.)

On July 8, 2011, Plaintiff presented at Fresno Medical Center for a follow up appointment and complained of right knee pain. (AR 513.) His treatment notes indicate normal range of motion and no swelling or tenderness of his joints, but Plaintiff reported posterior right knee pain upon palpation. (AR 514.) Plaintiff also reported that Ibuprofen helped with the pain. (AR 513.) On August 11, 2011, an MRI of Plaintiff's right knee revealed findings "suspicious but not completely diagnostic for a grade III intrameniscal tear[.]" (AR 503, 645.) Plaintiff continued to experience pain in his right knee at subsequent appointments between November 2011 and August 2013 when he refilled his medications, but no surgery was recommended and

---

[2] As Plaintiff's assertions of error are limited to the ALJ's consideration of Kweli Amusa, M.D.'s medical opinion, and the ALJ's adverse credibility determination against Plaintiff, only evidence relevant to those arguments is set forth in this Order.

[3] With the ALJ's permission, the 308 pages of progress notes from the Fresno Medical Center were submitted by Plaintiff after his hearing before the ALJ. (*See* Doc. 15 at 7–8; AR 440–748.)

Plaintiff was advised to treat his pain with non-steroid anti-inflammatory medications and exercise. (AR 444, 447, 453, 457, 460, 463, 468, 471, 474, 477, 480, 483, 486, 489, 491, 494, 497, 500.)

On September 9, 2013, Plaintiff reported pain in his right shoulder and Norco was prescribed for his pain. (AR 441–42.) An x-ray of Plaintiff's shoulder revealed unremarkable results and on October 14, 2013, Plaintiff was directed to stop taking Norco for his shoulder pain. (AR 739–40.) On November 27, 2013, Plaintiff was referred to physical therapy for his shoulder pain. (AR 736.) Plaintiff continued to complain of right knee and shoulder pain between December 2013 and January 2014, but no further treatment was recommended. (AR 726–27, 729–30, 734–35.) On February 28, 2014, Plaintiff reported that Ibuprofen was not helping his shoulder pain, and he was prescribed Norco. (AR 722.) An MRI of Plaintiff's right shoulder in March 2014 revealed findings consistent with extensive tendinosis involving the distal supraspinatus tendon, but no rotator cuff tear. (AR 633.) The doctor reviewing the images advised Plaintiff to consider an "MR arthrogram or direct arthroscopy of the joint space to confirm the MRI findings when clinically appropriate." (AR 634.)

On April 16, 2014, Plaintiff began to complain of left shoulder pain. (AR 719.) Plaintiff continued to complain of pain in both shoulders at appointments between June 2014 and April 2015, and Plaintiff was prescribed Norco for his pain. (AR 681, 684, 687–88, 690, 694, 698, 701–02, 705–06, 708–09, 713–14.) On August 6, 2015, Plaintiff stated his left shoulder pain was 10/10 and he had limited range of motion in neck and shoulders due to pain. (AR 676–77.)

On September 21, 2015, Plaintiff presented at Fresno Medical Center after being admitted to the hospital for two days due to partial small bowel obstructions. (AR 672.) Plaintiff stated he continued to have some intermittent abdominal pain, but the pain was not severe. (AR 672.) Although he continued to display limited range of motion in his neck and shoulders, his muscoskeletal examination revealed no swelling or tenderness of his joints, and an examination of his extremities was negative with no edema, cyanosis, or clubbing. (AR 672.)

On October 16, 2015, Plaintiff stated that he had not worked since September 2015, when he was admitted to the hospital for abdominal pain. (AR 664.) On November 13, 2015, Plaintiff

reported that a cervical injection performed by a pain management specialist improved his condition, but the pain returned to his shoulders after two weeks.  (AR 660.)  On December 11, 2015, Plaintiff continued to complain of abdominal pain.  (AR 656.)  His doctor noted Plaintiff's abdominal muscles was the primary source of his pain, but he also experienced "some" pain in his shoulders.  (AR 656–57.)

### 2.  S.S. Shantharam, M.D.

On October 20, 2011, Plaintiff presented to orthopedic surgeon, Dr. Shantharam, for an orthopedic consultation.  (AR 289–91.)  Plaintiff complained of pain in his right knee "periodically from time to time," but Dr. Shantharam's examination of Plaintiff's right knee revealed unremarkable results.  (AR 289–90.)  After reviewing Plaintiff's x-ray and MRI results, Dr. Shantharam concluded that "there is no compelling need for surgery" and advised Plaintiff to treat with exercise and anti-inflammatory medication.  (AR 290.)

### 3.  Dakota Sports Physical Therapy

On December 6, 2011, Plaintiff presented to Dakota Sports Physical Therapy for an initial evaluation.  (AR 299.)  Plaintiff reported that his right knee pain began when he fell on cement in 2004.  (AR 299.)  Plaintiff further reported that prolonged sitting, ambulation, and weight bearing, aggravated his pain.  (AR 299.)  The physical therapist observed that Plaintiff "exhibit[ed] poor medial kinetic chain mechanics, likely due to diminished strength throughout the pelvic girdle and LE," which "results in increased torsion at the knee and increased strain." (AR 299.)  The physical therapist recommended physical therapy two times a week for four weeks.  (AR 299.)

On February 5, 2013, Plaintiff presented to Dakota Sports Physical Therapy for another initial evaluation.  (AR 296.)  Plaintiff complained of "a constant ache and intermittent sharp pain along the joint line" in his right knee and reported that squatting, sitting, standing, and ambulation, aggravated his pain.  (AR 296.)  The physical therapist observed that Plaintiff "exhibit[ed] poor medial kinetic chain mechanics during functional closed-chain activities," which leads to "increase[d] torsion on the knee and may lead to strain."  (AR 296.)  The physical

therapist opined that Plaintiff would benefit from physical therapy and recommended physical therapy three times a week for four weeks.  (AR 296.)

### 4. Paul Ky, D.O.

On December 30, 2014, Plaintiff presented to Dr. Ky at Advanced Pain Solutions in Fresno, California for an initial consultation.  (AR 419.)  Plaintiff complained of bilateral upper back (cervical spine) pain, which he rated as 7/10.  (AR 419.)  Plaintiff reported difficulty grasping and gripping objects with his right hand and loss of range of motion in his right shoulder.  (AR 420.)  Following an examination, Dr. Ky diagnosed Plaintiff with thoracic outlet syndrome (right), abnormal posture with mild shoulder protraction, moderate obesity, cervical disc degeneration, diabetes mellitus II, cervicalgia, and radiculopathy/radiculitis-cervical.  (AR 422.)  Dr. Ky ordered an MRI of Plaintiff's cervical spine and both wrists, along with nerve conduction studies of both upper extremities.  (AR 423.)

The MRI of Plaintiff's right wrist, performed on January 10, 2015, revealed findings consistent with carpal tunnel syndrome, severe tendinosis and tenosynovitis, a torn ligament, and mild patchy bone marrow edema in the wrist volar which may have been post-traumatic or stress related in nature.  (AR 417.)  The MRI of Plaintiff's left wrist, also performed on January 10, 2015, revealed findings consistent with carpal tunnel syndrome, a torn and sprained ligament, severe tendinosis and tenosynovitis, and a small amount of fluid in a tendon which Plaintiff's doctor noted may represent DeQuervain's tenosynovitis (pain in the tendons of the thumb side of wrist).  (AR 414–15.)  The MRI of Plaintiff's cervical spine revealed degenerative changes of the cervical spine; a 2 mm right paracentral protrusion at the C2–C3 level; severe narrowing of the right lateral recess and severe right neural foraminal narrowing at C3–C4 with a 3 mm right paracentral/right foraminal protrusion that encroaches on the right C4 nerve root; mild to moderate right neural foraminal narrowing at the C4–C5 level with a 2 mm broad-based posterior protrusion that is eccentric to the right; moderate spinal canal stenosis, severe right neural foraminal narrowing, and mild left neural foraminal narrowing at the C5–C6 level with a 3 mm broad-based posterior protrusion that is eccentric to the right, right greater than left

uncovertebral hypertrophy, and endplate spurs anteriorly with encroachment on the right C6 nerve root; and a 2 mm central/right paracentral protrusion at the C6–C7 level. (AR 411.)

The electrodiagnostic study of Plaintiff's wrists, performed on January 15, 2015, revealed severe bilateral carpal tunnel syndrome, moderate to severe right cubital tunnel syndrome, and moderate sensorimotor peripheral neuropathy. (AR 426.)

Dr. Ky performed eight injection procedures between January 2015 and January 2016 to help relieve Plaintiff's pain symptoms. On January 27, 2015, Dr. Ky performed a peripheral nerve block to Plaintiff's right median nerve, and on February 10, 2015, Dr. Ky performed the same procedure on Plaintiff's left median nerve. (AR 385–90, 391–98.) On May 20, 2015, Dr. Ky performed a cervical transforaminal epidural steroid injection at the bilateral C4–C5 and bilateral C5–C6 levels. (AR 369–75.) Plaintiff reported significant radicular pain relief from the procedure, but he continued to experience neck pain. (AR 364.) Dr. Ky began prescribing Norco for Plaintiff's pain in April 2015, and Plaintiff reported "significant pain relief" when using Norco. (AR 341, 383.)

Dr. Ky performed cervical facet injections at the bilateral C2–C3 and bilateral C3–C4 levels in July 2015, and an injection in Plaintiff's right knee in August 2015. (AR 348–54, 355–62.) Dr. Ky also performed another peripheral nerve block to Plaintiff's left median nerve in September 2015, which Plaintiff reported reduced his pain by more than 50%. (AR 331, 336–345.) On November 9, 2015, Dr. Ky performed cervical facet injections at the bilateral C2–C3 and bilateral C3–C4 levels. (AR 323–29.) Plaintiff continued to report significant pain relief from his Norco prescription in December 2015. (AR 318.) On January 13, 2016, Dr. Ky performed a cervical transforaminal epidural steroid injection at the bilateral C4–C5 and bilateral C5–C6 levels. (AR 308–16.)

On April 7, 2016, Plaintiff rated his pain in his neck and arms as 7/10, but he continued to report that Norco provided significant pain relief.[4] (AR 750–51.) Plaintiff further reported moderate pain relief from the cervical injection performed in January 2016 and significant pain

---

[4] With the ALJ's permission, the seven pages of treatment notes from Plaintiff's April 2016 appointment with Dr. Ky were submitted by Plaintiff after his hearing before the ALJ. (*See* Doc. 15 at 7–8; AR 749–56.)

relief from the cervical facet injections performed in November 2015. (AR 751.) Dr. Ky noted that Plaintiff's lawyer and primary care physician had inquired about the possibility of surgery, and Dr. Ky stated that Plaintiff would benefit from a neurosurgery evaluation. (AR 754.)

### 5. Prahalad Jajodia, M.D.

On December 14, 2015, Plaintiff presented to Dr. Jajodia at the Digestive and Liver Disease Medical Center in Fresno, California, for a consultation. (AR 430–35.) Although Plaintiff complained of heartburn, he did not complain of any neck or shoulder pain and his medical history only lists diabetes, hypertension, and high cholesterol. (AR 430.) Dr. Jajodia observed Plaintiff to have a normal gait and physical examination of Plaintiff's extremities revealed that his joints were grossly intact. (AR 431.) Dr. Jajodia diagnosed Plaintiff with abdominal pain, unspecified dysphagia, and gastroesophageal reflux disease.

### 6. Samuel B. Rush, M.D.

On June 20, 2013, consultative examiner Dr. Rush, performed a complete internal medicine evaluation of Plaintiff. (AR 302–06.) Plaintiff complained of carpal tunnel syndrome in both hands and right knee pain, but Plaintiff stated he had several courses of physical therapy, which helped with the knee pain. (AR 302.) Upon physical examination, Dr. Rush observed Plaintiff to have normal ranges of motion in all extremities and the spine, and normal bilateral handgrip strength. (AR 304–05.)

Dr. Rush assessed Plaintiff with carpal tunnel syndrome in both hands, right knee pain with normal range of motion and no significant abnormalities on the MRI, diabetes mellitus type II in poor control on current medications, and high blood pressure in good control on small amounts of medication. (AR 305.) Dr. Rush also noted Plaintiff was moderately overweight and a smoker with no evidence of organ damage. (AR 305.) Based on his examination and review of Plaintiff's medical history, Dr. Rush opined Plaintiff would have no physical limitations. (AR 305–06.)

### 7. State Agency Physicians

On July 2, 2013, Ralph Hellams, M.D., a Disability Determination Services medical consultant, reviewed the medical evidence of record and concluded that Plaintiff's impairments

were non-severe.  (AR 79.)  Upon reconsideration, on March 14, 2014, another Disability Determination Services medical consultant, Craig Billinghurst, M.D., performed an independent review of Plaintiff's medical records and affirmed Dr. Hellams' opinion.  (AR 96–97.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's applications for DIB and SSI benefits on July 8, 2013, and again on reconsideration on March 17, 2014.  (AR 110–15, 126–35.)  Consequently, on May 15, 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 136.)  Plaintiff appeared with counsel at the hearing on March 16, 2016, and testified before an ALJ as to his alleged disabling conditions.  (AR 20; *see generally* AR 38–75.)

**1.    Plaintiff's Testimony**

Plaintiff testified that he is unable to work because of pain in his neck, lower back, and both knees, although his right knee hurts more than his left knee.  (AR 50.)  Plaintiff testified that he began working at Walmart as a stocker in June 2014, but his manager switched his position to a cashier after his manager noticed the problems Plaintiff was having getting down on his knees.  (AR 52.)  Plaintiff stopped working at Walmart in September 2015 because he was hospitalized due to gastritis and stomach pains.  (AR 52–53.)  According to Plaintiff, he received California state disability income while he was waiting to see a specialist for his gastritis, but Walmart let him go in January 2016 when he did not return to work.  (AR 58–59.)

Plaintiff testified that he complained to his pain management doctor, Dr. Ky, about pain in his wrists in early 2015 and Dr. Ky stated that he would not perform any microscopic surgery because Plaintiff's insurance would not cover it.  (AR 64.)  Instead, Dr. Ky opted to give Plaintiff injections to treat his pain.  (AR 64.)

**2.    Medical Testimony**

Medical expert Kweli Amusa, M.D., reviewed Plaintiff's medical records and testified at the hearing as to Plaintiff's functional capabilities.[5]  Specifically, Dr. Amusa opined that Plaintiff was able to lift ten pounds occasionally and less than ten pounds frequently, stand and/or walk

---

[5] Dr. Amusa did not review the 315 pages of medical evidence submitted after the administrative hearing.  (Doc. 15 at 6 n.1.)

8

for at least six[6] hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (AR 53–54, 60.) Dr. Amusa also opined that Plaintiff should avoid ladders, ropes and scaffolds, and was limited to occasionally kneeling, crouching, crawling, and stooping, and occasionally reaching overhead on his right, but Plaintiff could frequently climb stairs and frequently handle and finger with his upper extremities. (AR 60, 66.) Additionally, according to Dr. Amusa, Plaintiff would not have any difficulty viewing a monitor or television screen for prolonged periods because he would be able to adjust his head and neck to remain comfortable. (AR 62–63.) In support of her opinion, Dr. Amusa referred to Plaintiff's treatment record for chronic pain in the neck and upper extremities including multiple procedures in 2015 to treat his pain, an EMG nerve conduction study that revealed severe bilateral carpal tunnel syndrome, and MRIs showing inflammation of the major tendons in Plaintiff's wrists. (AR 54–55, 60.)

Dr. Amusa's opinion did not reflect any side effects from Plaintiff's medications because his pain management doctor did not indicate there was any intolerance for his medications. (AR 61.) Dr. Amusa also testified that she did not see any evidence in the record that suggested Plaintiff needed any kind of breaks during the workday due to chronic pain. (AR 61.)

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff has past work experience as (1) a shipping and receiving clerk, Dictionary of Operational Titles ("DOT") code 922.687-058, which was medium work, with a specific vocational preparation ("SVP") of 2; and (2) auto parts counter clerk, DOT code 279.357-062, which was light work, with an SVP of 5. (AR 71.)

The ALJ also asked the VE two hypothetical questions. First, the ALJ asked the VE to consider a person who can stand and/or walk six hours out of an eight-hour day and sit for six hours out of an eight-hour day, and is limited to lifting and/or carrying ten pounds occasionally and less than ten pounds frequently. (AR 70.) This person would also miss work more than two days per month and be limited to occasionally stooping, crouching, and kneeling; occasionally manipulating and handling bilaterally; frequently balancing and climbing stairs or ramps; and

---

[6] Dr. Amusa initially testified that Plaintiff was limited to standing and/or walking for fours in an eight-hour workday, but later amended her opinion to find that Plaintiff could stand and/or walk for six hours in an eight-hour workday. (*See* AR 54, 60.)

never working at unprotected heights, crawling, or climbing ladders, scaffolds, or ropes. (AR 70.) The ALJ then asked the VE whether, given these limitations, such a person could perform any of Plaintiff's past work. (AR 71.) The VE testified that such a person would not be able to perform any of Plaintiff's past relevant work or any other work in the national economy. (AR 72.)

The ALJ then asked the VE a second hypothetical question considering the same person with the same capabilities as outlined in the first hypothetical, but who will miss less than one day of work per month, and is capable of lifting and/or carrying twenty pounds occasionally and ten pounds frequently, and frequently manipulating and handling bilaterally. (AR 72–73.) The VE testified that such a person could perform Plaintiff's past work as an auto parts counter clerk. (AR 73.) Additionally, he could perform the following light work: (1) office helper, DOT code 239.567-010, and (2) inspector, DOT code 559.687-074. (AR 73.)

Plaintiff's counsel also asked the VE two hypothetical questions. First, Plaintiff's counsel asked whether the VE's response would be different if the individual described in the ALJ's second hypothetical would need an unscheduled, one-hour break each day. (AR 74.) The VE responded that such a person would not be able to perform the jobs described in response to the ALJ's second hypothetical question. (AR 74.)

Next, Plaintiff's counsel asked whether the VE's response would be different if the individual described in the ALJ's second hypothetical would be off-task for 20% of the work day. (AR 74.) The VE responded that such a person would not be able to perform the jobs described in response to the ALJ's second hypothetical question. (AR 74.)

**C.    The ALJ's Decision**

In a decision dated May 18, 2016, the ALJ found that Plaintiff was not disabled. (AR 20–30.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 416.920 and 404.1520. (AR 22–30.) First, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date, September 19, 2015, through the date of the decision. (AR 22.) At Step Two, the ALJ found that Plaintiff had the severe impairments of carpal tunnel syndrome, diabetes mellitus, knee pain with right knee worse than left, neck pain, and lower back

pain.  (AR 23.)  However, at Step Three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (AR 23.)  The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[7]

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; frequently climb stair/ramps and balance; never climb ladders/scaffolds/ropes; occasionally stoop, crouch, and kneel; never crawl; frequently perform manipulative activities bilaterally; and cannot be exposed to unprotected heights or heavy moving/dangerous machinery.  Additionally, the claimant would miss less than 1 day of work per month.

(AR 24.)  Of particular relevance to the claims asserted by Plaintiff in the instant action, the ALJ gave some weight to Dr. Amusa's opinion because it was consistent with Plaintiff's conservative treatment history and Plaintiff's statements that his medications and cervical injections caused significant improvement.  (AR 27.)  However, the ALJ accorded little weight to Dr. Amusa's opinion that Plaintiff could only lift and/or carry less than ten pounds frequently and ten pounds occasionally because "it is overly restrictive and inconsistent with the claimant's treatment records, which only include objective findings from the period when the claimant was still doing light work prior to September 2015 and only document conservative treatment, with no surgery recommendations, and the claimant repeatedly described significant improvement."  (AR 27–28.)

The ALJ also found Plaintiff's statements concerning his symptoms not entirely credible because his testimony was undermined by his work history, his record of improvement from medications and other treatment, and his ability to do some yardwork and shop for groceries.  (AR 24–25.)  The ALJ determined that, given his RFC, Plaintiff was able to perform his past work as an auto parts counter clerk (Step Four), and Plaintiff was not disabled because he could perform a

---

[7] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

significant number of other jobs in the local and national economies, specifically office helper and inspector (Step Five). (AR 28–30.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on July 11, 2017. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Plaintiff filed a complaint before this Court on September 14, 2017, seeking review of the ALJ's decision. (Doc. 1.)

## III. SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec*., 528 F.3d 1194, 1198 (9th Cir. 2008). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV. APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or

12

impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, before considering the Fourth Step, the ALJ must determine the claimant's residual functional capacity, which is the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from the claimant's impairments. *Id*. §§ 404.1520(e), 416.920(e). Next, at Step Four, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

In his Opening Brief, Plaintiff contends the ALJ erred in two respects: (1) the ALJ improperly considered Dr. Amusa's opinion because she did not have the benefit of reviewing the 315 pages of medical evidence submitted after the hearing, and (2) the ALJ failed to articulate clear and convincing reasons for discrediting Plaintiff's subjective complaints. (*See generally*

Doc. 15 at 12–13.)  Defendant responds that the ALJ properly weighed the medical evidence in discrediting Dr. Amusa's opinion and provided sufficient reasons for discrediting Plaintiff's subjective complaints.  (Doc. 18 at 5–11.)

**A.     The ALJ's Consideration of the Medical Opinions**

**1.     Legal Standard**

The ALJ must consider and evaluate every medical opinion of record.  *See* 20 C.F.R. §§ 404.1527(b) and (c) (applying to claims filed before March 27, 2017), 416.927 (b) and (c) (same); *Mora v. Berryhill*, No. 1:16–cv–01279–SKO, 2018 WL 636923, at *10 (E.D. Cal. Jan. 31, 2018).  In doing so, the ALJ "cannot reject [medical] evidence for no reason or the wrong reason." *Mora*, 2018 WL 636923, at *10.

Cases in this circuit distinguish between three types of medical opinions: (1) those given by a physician who treated the claimant (treating physician); (2) those given by a physician who examined but did not treat the claimant (examining physicians); and (3) those given by a physician who neither examined nor treated the claimant (non-examining physicians). *Fatheree v. Colvin*, No. 1:13–cv–01577–SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)). The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).  However, the opinions of non-treating or non-examining physicians may also serve as substantial evidence in support of an ALJ's decision "when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

"The Commissioner may reject the opinion of a non-examining physician by reference to

specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998); *see also Mojarro v. Berryhill*, No. 1:15–cv–1692–BAM, 2017 WL 1166266, at *6 (E.D. Cal. Mar. 29, 2017), *aff'd*, No. 17-15624, 2018 WL 3947777 (9th Cir. Aug. 17, 2018)) ("In order to reject the opinion of a non-examining physician, the ALJ need only reference specific evidence in the record.").

### 2. Dr. Amusa's Opinion Constitutes Substantial Evidence in Support of the ALJ's Decision.

Dr. Amusa did not examine Plaintiff directly, but she provided an opinion regarding Plaintiff's ability to work at the hearing before the ALJ. The opinions of a non-treating or non-examining physicians, such as Dr. Amusa, may serve as substantial evidence in support of an ALJ's decision "when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957.

Here, the Court finds the ALJ adequately identified evidence in the record that is consistent with Dr. Amusa's opinion. Specifically, the ALJ found that Dr. Amusa's opinion was "consistent with the claimant's conservative treatment history and his repeated statements that his medications and cervical injections caused him significant improvement." (AR 27.) In so finding, the ALJ cited to specific portions of the record showing Plaintiff managed his pain with conservative treatment including medication and cervical injections. (AR 27 (citing AR 318, 331, 341, 651, 656, 660, 751).) Notably, the ALJ cited to medical evidence that Plaintiff submitted both before and after the hearing, which demonstrates the ALJ considered the degree to which all the medical evidence in the record was consistent with Dr. Amusa's opinion. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."). Therefore, because the ALJ identified evidence in the record consistent with Dr. Amusa's opinion, the opinion constitutes substantial evidence in support of the ALJ's decision. *Thomas*, 278 F.3d at 957.

Plaintiff responds to the ALJ's analysis of Dr. Amusa's opinion by broadly asserting the ALJ erred because Dr. Amusa did not have the benefit of reviewing the 315 additional pages of evidence that Plaintiff submitted after the hearing. (Doc. 15 at 12–13.) However, Plaintiff fails

to cite any authority in support of his position that a doctor's opinion is only valid if the doctor has reviewed a claimant's entire medical record. To the contrary, there is ample authority finding that an ALJ may still rely on a doctor's opinion, even if the doctor has not reviewed the entire medical record, as long as it is consistent with other medical evidence in the record. *Woodsum v. Astrue*, 711 F. Supp. 2d 1239, 1260 (W.D. Wash. 2010) ("[T]he mere fact that a non-examining physician does not have the benefit of reviewing medical evidence made part of the record subsequent to the issuance of his or her opinion, will not prevent that opinion from being properly adopted—assuming, of course, that it is consistent with other independent evidence in the record[.]"); *Bonner v. Comm'r of Soc. Sec.*, No. 2:16–cv–1781–KJN, 2017 WL 3478991, at *4 (E.D. Cal. Aug. 14, 2017) ("To be sure, failure to provide a consultative examiner with a claimant's medical records may not be material in every case . . ."); *see also Anglin v. Berryhill*, No. 1:16–cv–00566–SKO, 2017 WL 3334008, at *6 (E.D. Cal. Aug. 4, 2017) (upholding the ALJ's decision and finding new evidence submitted to the Appeals Council, which was not considered by any of the medical experts, did not undermine the ALJ's decision).[8]  Accordingly, because Plaintiff has failed to provide any authority requiring the ALJ to only rely on a doctor's opinion if the doctor has reviewed Plaintiff's entire medical record, Plaintiff has failed to satisfy his burden of showing the ALJ erred by relying on Dr. Amusa's opinion. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (alterations in original) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009))).

**3.      The ALJ Stated Sufficient Reasons for Partially Discrediting Dr. Amusa's Opinion.**

As a non-examining physician, the ALJ need only reference specific evidence in the record to discredit Dr. Amusa's opinion. *Sousa*, 143 F.3d at 1244. Here, while the ALJ gave some

---

[8] The Court notes that almost all the new medical evidence Plaintiff submitted was available prior to the March 16, 2016 hearing (308 of the 315 pages of additional medical records are dated between January 2011 and January 2016), and Plaintiff's counsel had an obligation to provide such material in timely manner. 20 C.F.R. §§ 404.1740(b)(1) ("A representative must . . . [a]ct with reasonable promptness to help obtain the information or evidence that the claimant must submit under our regulations, and forward the information or evidence to us for consideration as soon as practicable."), 416.1540(b)(1) (same).

weight to Dr. Amusa's opinion to the extent it was consistent with the ALJ's RFC, the ALJ also assigned little weight to Dr. Amusa's opinion that Plaintiff could only lift and/or carry less than ten pounds frequently and ten pounds occasionally because:

> [I]t is overly restrictive and inconsistent with the claimant's treatment records, which only include objective findings from the period when the claimant was still doing light work prior to September 2015 and only document conservative treatment, with no surgery recommendations, and the claimant repeatedly described significant improvement.

(AR 27–28.) In other words, the ALJ partially discredited Dr. Amusa's opinion because 1) there was no supporting objective medical evidence in the record after September 2015, and 2) the record showed Plaintiff successfully managed his pain with conservative treatment including medications.

Plaintiff responds to the ALJ's first reason for discrediting Dr. Amusa by identifying objective medical evidence in the record after September 2015 that supports Dr. Amusa's opinion. Specifically, Plaintiff points to Dr. Ky's treatment notes from April 7, 2016, where Dr. Ky found Plaintiff to have reduced range of motion in his cervical spine, diminished sensation along the right C4 and right C6 root distribution and left median nerve, moderate spams along the cervical spine, and abnormal posture. (Doc. 19 at 4–5 (citing AR 750–55).) Plaintiff also identifies portions of his progress notes from the Fresno Medical Center between September 21, 2015, and January 22, 2016, that show limited range of motion in his neck and shoulders and "weaker left grip." (Doc. 19 at 5 (citing AR 650–54, 655–58, 659–62, 663–66, 667–70, 671–74).) Furthermore, Dr. Amusa herself referenced Exhibit 4F in the record as support for her sedentary lifting and carrying opinion (*see* AR 54), which includes Dr. Ky's treatment notes from Plaintiff's October and December 2015 appointments finding limited range of motion in his cervical spine and moderate spasms along the cervical spine. (AR 319, 332.)

These treatment notes finding limited range of motion, spasms, and sensory deficiencies constitute objective findings in Plaintiff's medical record. 20 C.F.R. § 404.1529(c)(2) (defining "objective medical evidence" as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, **such as evidence of reduced joint motion, muscle**

**spasm, sensory deficit or motor disruption**" (emphasis added)); 20 C.F.R. § 404.929(c)(2)

(same); *see also Attia v. Astrue*, No. 1:06–cv–00778–SMS, 2007 WL 2802006, at *28 (E.D. Cal.

Sept. 24, 2007) ("'[O]bjective medical evidence' refers to any evidence that an examining doctor

can discover and substantiate; it is not limited to concrete physiological data, but includes all

evidence that is amenable to external testing." (citing *Luna v. Bowen*, 834 F.2d 161, 162 (10th Cir.

1987))). Accordingly, because the record contains objective medical findings after September

2015 supporting Dr. Amusa's sedentary carrying and lifting limitation, the ALJ erred by

discrediting Dr. Amusa's opinion on the basis that no such evidence existed.

While the ALJ erred by citing a lack of objective findings in the record as a reason for

partially discrediting Dr. Amusa's opinion, such error is harmless because Plaintiff's record of

successful conservative treatment, as described below, provides an independent basis for

discrediting Dr. Amusa's opinion. *Barber v. Astrue*, No. 1:10–cv–01432–AWI–SKO, 2012 WL

458076, at *13 (E.D. Cal. Feb. 10, 2012) (finding harmless error where the ALJ "stated other valid

reasons" for rejecting a physician's opinion) (citing *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th

Cir. 2006) and *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005)); *Rodriguez v. Berryhill*, No. 1:15–

cv–01780–SKO, 2017 WL 896304, at *11 (E.D. Cal. Mar. 7, 2017) ("[B]ecause the ALJ

articulated another, permissible reason for rejecting Dr. Raypon's assessment of Plaintiff, namely

the lack of support in the medical record, this error is harmless." (citing *Carmickle v. Comm'r,

Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008))).

An ALJ may discredit a physician's opinion that is inconsistent with a claimant's treatment

records showing improvement from conservative treatment. *Embernate v. Berryhill*, No. 2:17–

cv–0040–JAM–DB, 2018 WL 888986, at *6 (E.D. Cal. Feb. 14, 2018) ("An ALJ may discount a

physician's opinion if it is inconsistent with the plaintiff's conservative treatment."); *Rollins v.

Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (finding an ALJ reasonably discounted a physician's

opinion where the claimant received conservative treatment); *see also Warre v. Comm'r of the Soc.

Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively

with medication are not disabling for the purpose of determining eligibility for [disability]

benefits"). Here, the ALJ cited to specific pages in the record documenting Plaintiff's

conservative treatment where Plaintiff stated his medications and epidural injections significantly relieved his pain symptoms. (AR 28 (citing AR 318, 331, 341, 651, 656, 660, 751).) The ALJ also noted there was no recommendation for surgery in the record and Plaintiff conceded at the hearing on March 16, 2016, that there was no evidence in the record of a doctor recommending surgery up to that date. (AR 28, 64.) Therefore, the ALJ properly discredited Dr. Amusa's sedentary carrying and/or lifting limitation as inconsistent with Plaintiff's conservative treatment record.

Plaintiff disputes the ALJ's characterization of Plaintiff's treatment as "conservative." Specifically, Plaintiff contends "being prescribed narcotic pain medication . . . is not considered 'conservative' treatment." (Doc. 19 at 5.) However, "courts have frequently found that the fact that Plaintiff has been prescribed narcotic medication or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment *as a whole* was conservative, particularly when undertaken in addition to other, less invasive treatment methods." *Weikel v. Berryhill*, No. 1:16–cv–01336–SKO, 2018 WL 1142194, at *16 (E.D. Cal. Mar. 2, 2018) (emphasis in original) (conservative treatment included prescriptions for Vicodin and Norco and four injections for pain and inflammation); *see also Traynor v. Colvin*, No. 1:13–cv–1041–BAM, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014) (finding evidence that Plaintiff's symptoms were managed through "prescription medications and infrequent epidural and cortisone injections" was "conservative treatment"); *Morris v. Colvin*, No. 13–6236, 2014 WL 2547599, at *4 (C.D. Cal. June 3, 2014) ("conservative treatment" consisted of physical therapy, use of TENS unit, chiropractic treatment, Vicodin, and Tylenol with Vicodin); *Jones v. Comm'r of Soc. Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at *7–10 (E.D. Cal. Jan. 21, 2014) (finding "conservative treatment" included physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy).

Here, Plaintiff was prescribed Norco and received epidural injections, but he was also advised to treat his pain with exercise and anti-inflammatory medication. (AR 290.) Plaintiff also had several courses of physical therapy, which helped with his knee pain. (AR 302.) Therefore, because the record as a whole demonstrates Plaintiff's treatment was conservative, the ALJ did

not err by characterizing Plaintiff's treatment record as conservative and partially discrediting Dr. Amusa's opinion based on Plaintiff's conservative treatment record.

Plaintiff also contends the ALJ erred in stating that the record contained no recommendations for surgery. (Doc. 15 at 12.) Plaintiff points to Dr. Ky's treatment notes from Plaintiff's post-hearing appointment on April 7, 2016, where Dr. Ky stated Plaintiff "would benefit from a surgical evaluation from neurosurgery." (Doc. 15 at 12 (citing AR 754).) However, this is not a recommendation for surgery as Plaintiff suggests. Instead, it is merely an acknowledgment that it would be helpful to obtain the opinion of a neurosurgeon. Thus, the ALJ's statement that the record contains no recommendations for surgery, remains uncontradicted.

Moreover, Dr. Ky prefaces his recommendation for a surgery evaluation by stating "Plaintiff has been noticing greater lower back pain with radiculitis **as of late.**" (AR 754 (emphasis added).) To the extent Plaintiff's condition became more severe in April 2016, the recommendation to obtain a surgery evaluation at that time does not invalidate the ALJ's conclusion that Plaintiff was not disabled since his alleged onset date on September 19, 2015, when Plaintiff was effectively treating his pain with medications and other conservative methods. Rather, the escalation in the severity of Plaintiff's condition may indicate that Plaintiff subsequently became "disabled" under the applicable Social Security guidelines and Plaintiff should consider reapplying for benefits for a period beginning after the ALJ's May 2016 decision. 42 U.S.C. § 423(d)(1)(A) (defining "disability" as the inability to work due to an impairment that "can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"); 42 U.S.C. § 1382c(a)(3)(A) (same).

In sum, while the ALJ erred by finding no objective evidence supported Dr. Amusa's opinion after the alleged onset date of September 19, 2015, the error is harmless because the ALJ properly relied on Plaintiff's conservative treatment record to discredit Dr. Amusa's sedentary lifting and/or carrying limitation. Additionally, the ALJ properly found Plaintiff's conservative treatment record included no recommendation for surgery, and that Plaintiff's pain management doctor simply noted Plaintiff would benefit from an evaluation by a neurosurgeon.

**B.    The ALJ's Consideration of Plaintiff's Credibility**

    **1.    Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, the ALJ must engage in a two-prong analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1035–36). Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection. *Id.*

As to the second prong, "[t]he clear and convincing standard is 'not an easy requirement to meet' and it 'is the most demanding standard required in Social Security cases.'" *Wells v. Comm'r of Soc. Sec.*, No. 1:17–cv–00078–SKO, 2017 WL 3620054, at *6 (E.D. Cal. Aug. 23, 2017) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014)). "General findings are insufficient" to satisfy this standard. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted). "[R]ather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*; *see, e.g.*, *Vasquez*, 572 F.3d at 592 ("To support a lack of credibility finding, the ALJ [is] required to 'point to specific facts in the record which demonstrate that [the claimant] is in less pain than [he] claims.'" (quoting *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993))); *cf. Burrell*, 775 F.3d at 1138 (stating that the Ninth Circuit's "decisions make clear that [courts] may not take a general finding . . . and comb the administrative record to find specific" support for the finding).

    **2.    The ALJ Properly Discounted Plaintiff's Subjective Complaints.**

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible for several reasons:

At the hearing, the claimant alleged that he could not do his job previous to September 2015 when he stopped working, but continued to do his job because he "had no choice," and stopped working after he was hospitalized for gastritis for 3 days in September 2015, which suggests that his ability to work was only impacted by his brief episode of gastritis that has since resolved. The claimant alleged ongoing neck pain, back pain, and knee pain; however, he repeatedly told his treating doctors that these symptoms had significantly improved with his medications and cervical injections and did not request any changes in his medications [citations]. The undersigned also notes that the claimant wrote on his function report that he is able to do some yardwork and shops for groceries [citation], which tends to suggest that his symptoms are not as severe as alleged.

(AR 24–25.) In sum, the ALJ found Plaintiff's testimony was undermined by 1) the fact that Plaintiff successfully worked when he alleged he was unable to work and only stopped working due to an acute episode of gastritis, rather than the severity of his pain; 2) the improvement Plaintiff experienced from his medication and other treatment;[9] and 3) his activities of daily living including yardwork and shopping for groceries.

a. Work History

The ALJ properly found that Plaintiff's credibility was weakened by his ability to work during a time when he claimed he could not work, and his testimony that he stopped working for reasons unrelated to any alleged impairment. An ALJ may "make an adverse credibility finding based on a claimant's work history where the claimant lost their previous employment due to reasons that were not related to their disability." *Wells*, 2017 WL 3620054, at *8. Here, Plaintiff testified that he stopped working as a cashier at Walmart because he was hospitalized due to abdominal pains that turned out to be gastritis. (AR 57.) When Plaintiff was released from the hospital, he did not return to work and waited for an appointment to see a specialist for his abdominal pains. (AR 58.) Plaintiff testified that while he was waiting for an appointment related to his abdominal pains, Walmart let him go from his position as a cashier. (AR 58.) Accordingly, Plaintiff did not stop working due to an impairment, and the ALJ properly considered this fact in

---

[9] Plaintiff erroneously states the ALJ discounted Plaintiff's testimony based on his conservative treatment record. (Doc. 15 at 14–15, Doc. 19 at 9–10.) However, the ALJ did not discuss Plaintiff's conservative treatment record as a reason for discounting Plaintiff's testimony. Rather, the ALJ only discredited Dr. Amusa based on Plaintiff's conservative treatment and found Plaintiff's conservative treatment record would not support a more restrictive RFC. (AR 28.) Nonetheless, to the extent the ALJ implicitly discredited Plaintiff's testimony based on his conservative treatment record, the Court finds Plaintiff's treatment record is properly characterized as conservative. *See supra* Section V.A.3.

discrediting Plaintiff's testimony that he could not work due to pain.  *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (ALJ did not err in considering the claimant's work history and his admission that he left his job for reasons other than his alleged impairment); *Drouin v. Sullivan*, 966 F.2d 1255, 1259 (9th Cir. 1992) (ALJ did not err in considering that, "according to [the claimant's] own testimony, she did not lose her past two jobs because of pain");  *Caldwell v. Comm'r of Soc. Sec.*, No. 2:15–cv–1002–KJN, 2016 WL 4041331, at *6 (E.D. Cal. July 26, 2016) (finding that "the ALJ reasonably relied on [the] plaintiff's work record in discounting her credibility" where "there [was] evidence suggesting that [the] plaintiff had stopped working for reasons not related to her impairments").

Plaintiff fails to respond to this valid reason provided by the ALJ for discrediting Plaintiff's testimony; he makes no argument that the ALJ erred by discounting Plaintiff's credibility based on his dismissal from work for reasons unrelated to his impairments.  Instead, Plaintiff responds by emphasizing that he only worked successfully prior to his alleged onset date of September 19, 2015, and contends that any work history prior to his alleged onset date is irrelevant.  (Doc. 15 at 14, Doc. 19 at 7.)  In doing so, Plaintiff appears to misunderstand the ALJ's reasoning.  The ALJ did not discredit Plaintiff solely because he worked prior to his alleged onset date.  Rather, the ALJ reasoned Plaintiff was less credible because Plaintiff testified that he could not do his job prior to September 2015, but Plaintiff successfully worked thirty-two hours a week for over a year while he was supposedly unable to work.  (AR 24, 42–43, 57.)  This inconsistency between Plaintiff's testimony and his work history, even prior to his alleged onset date, was a clear and convincing reason for discounting Plaintiff's testimony.  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) ("In reaching a credibility determination, an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors."); *Crosby v. Comm'r of Soc. Sec. Admin.*, 489 Fed. Appx. 166, 168 (9th Cir. 2012) (upholding credibility determination based on the fact that the claimant's testimony that he suffered debilitating symptoms was inconsistent "with his work history showing that his longstanding conditions did not preclude work in the past"); *Hutton v. Comm'r of Soc. Sec.*, No. 2:15–cv–2002–KJN, 2017 WL 68261, at *6 (E.D. Cal. Jan. 6, 2017) (affirming the ALJ's

credibility determination where "the ALJ noted that while plaintiff incurred his brain injury in 1983, that condition had not prevented him from working consistently between 1993 and 2011" and his alleged onset date was in 2011). Accordingly, the ALJ did not err in discounting the credibility of Plaintiff's subjective complaints based on inconsistencies between his testimony and his work history, including his admission that he left his job for reasons other than his alleged impairment.

### b. Improved Symptoms

The ALJ properly found that Plaintiff's medication and other treatments relieved his pain symptoms. (AR 24–25.) The ALJ was entitled to discount Plaintiff's credibility based on his successful response to treatment and medication. *Calderon v. Colvin*, No. 1:14–cv–00161–BAM, 2015 WL 5022955, at *9 (E.D. Cal. Aug. 24, 2015) (finding no error where the ALJ discredited Plaintiff's testimony and noted that monthly injections and pain medication alleviated Plaintiff's back pain); *Traynor*, 2014 WL 4792593, at *9 (finding that the ALJ properly discredited Plaintiff's allegations of disabling pain from carpal tunnel syndrome where Plaintiff reported improvement in his pain symptoms from medication and injections in his hands and wrists) (citing *Warre*, 439 F.3d at 1006); *Cox v. Berryhill*, No. 16–cv–0306–BAM, 2017 WL 3172984, at *5 (E.D. Cal. July 26, 2017) ("The ALJ's finding that Plaintiff's improvement with medication and treatment undercut Plaintiff's allegations of total disability was a legally sufficient basis to reject the extent of Plaintiff's symptom testimony."); *Urrabazo v. Colvin*, No. 1:14–cv–00309–SKO, 2015 WL 4392988, at *15 (E.D. Cal. July 17, 2015) (In assessing a claimant's credibility, the ALJ was "entitled to consider that Plaintiff's pain medication was helping to relieve his knee pain.").

Here, ample evidence in the record demonstrates that medication and other treatments helped relieve Plaintiff's pain symptoms and the ALJ identified the evidence with specific citations to exhibits and pages in record. The ALJ found that despite Plaintiff's claims of disabling neck, knee, and back pain, he "repeatedly told his treating doctors that these symptoms had significantly improved with his medications and cervical injections." (AR 24–25.) The ALJ cited treatment notes from Plaintiff's pain management doctor noting that Plaintiff experienced significant pain relief from his medication and "greater than 50% pain relief" from nerve blocking

injections.  (AR 25 (citing AR 318, 331, 341).)  The ALJ also cited Plaintiff's treatment notes from the Fresno Medical Center noting that cervical injections improved Plaintiff's pain symptoms.  (AR 25 (citing AR 660).)  The ALJ also noted that Plaintiff never requested any changes to his medication prescriptions.  (AR 25.)

Plaintiff responds by pointing to other evidence in the record and contends that the improvement was temporary and the treatment only provided minimal relief.  (Doc. 15 at 14–15.)  To be sure, the record also contains some contrary evidence, such as Plaintiff's complaints of continued pain and limited range of motion.  However, "credibility determinations are the province of the ALJ" and it is the function of the ALJ to resolve any ambiguities.  *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989) (finding no error with the ALJ's credibility determination even though the ALJ "could easily have relied on other nonmedical evidence in the record to reach the opposite conclusion"); *Rollins*, 261 F.3d at 857 (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and noting that the ALJ's interpretation "may not be the only reasonable one").  Here, by citing to specific portions of the record demonstrating that Plaintiff experienced significant relief from his medication and other treatment, the ALJ set forth a clear and convincing reason for discounting the credibility of Plaintiff's subjective complaints.  Thus, the ALJ satisfied his burden to make "a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony."  *Thomas*, 278 F.3d at 958.  Although Plaintiff may disagree with the specific findings, the findings were supported by clear and convincing evidence in the record and the Court will not second-guess them.  *Id.* at 959.

### c.  Activities of Daily Living

Generally, an ALJ may consider a claimant's activities of daily living in determining that Plaintiff was not entirely credible.  *Burch*, 400 F.3d at 681.  Daily activities "may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'"  *Orn*, 495 F.3d at 639 (quoting *Fair*, 885 F.2d at 603).  However, "[t]he ALJ must make

'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.* (quoting *Burch*, 400 F.3d at 681). The ALJ must state "*which* daily activities conflicted with *which* part of Claimant's testimony." *Burrell*, 775 F.3d at 1138 (emphasis in original).

Here, the ALJ's entire analysis of Plaintiff's activities of daily living is as follows: Plaintiff "wrote on his function report that he is able to do some yardwork and shops for groceries (Exhibit 5E/4-5), which tends to suggest that his symptoms are not as severe as alleged." (AR 24.) The ALJ only cited Plaintiff's function report from his DIB and SSI benefits application in support of this finding. The ALJ did not cite any other examples in the record describing Plaintiff's activities of daily living, and the ALJ did not ask any questions at the hearing regarding Plaintiff's daily routine or any details related to his ability to do yardwork and shop for groceries. Additionally, the ALJ did not make any specific findings regarding whether Plaintiff spent a substantial portion of his day performing such activities or how those activities were transferable to a work setting. Such blanket statements that daily activities are inconsistent with a claimant's alleged severity of his pain, are not clear and convincing reasons for discrediting a claimant's testimony. *Schultz v. Colvin*, No. 2:15–cv–933–EFB, 2016 WL 5661827, at *6 (E.D. Cal. Sept. 30, 2016) ("[T]he general finding, without explanation, does not constitute a clear and convincing basis for discrediting plaintiff's specific testimony." (citing *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015)); *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.").

Defendant defends the ALJ's reasoning by merely summarizing the ALJ's opinion. (Doc. 18 at 12.) Specifically, Defendant states the ALJ "did not find that Plaintiff's activities of daily living were tantamount to sustained activities transferrable to a work setting," but found Plaintiff's ability to perform yardwork and shop for groceries undermined Plaintiff's allegations of disabling pain. (Doc. 18 at 12.) According to Defendant, even though Plaintiff's briefs cite several authorities from the Ninth Circuit requiring an ALJ to make specific findings related to a claimant's activities of daily living, Plaintiff failed to show reversible error. However, Defendant

cites no authority supporting her apparent position that the ALJ can discredit a claimant's testimony by merely stating that a claimant performed certain activities, without making specific findings regarding how those activities are inconsistent with a claimant's testimony. Accordingly, the Court finds the ALJ erred by failing to make specific findings regarding whether Plaintiff's daily activities demonstrate that he spends "a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting." *Orn*, 495 F.3d at 639.

Even though the ALJ erred in his analysis of Plaintiff's activities of daily living, Plaintiff's work history and improvement from medication and other treatments provide independent clear and convincing reasons to discredit Plaintiff's testimony. Specifically, Plaintiff's credibility was weakened by his ability to work during a time when he claimed he could not work, and the uncontroverted evidence in the medical record showing medication and other treatments helped relieve Plaintiff's pain symptoms. (*See* AR 42–43, 57, 318, 331, 34.) Accordingly, any error is harmless and reversal is not warranted. *See Carmickle*, 533 F.3d at 1162 ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion,' such is deemed harmless and does not warrant reversal." (alterations in original) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004))); *Wells*, 2017 WL 3620054, at *10 ("While the ALJ erred in providing one invalid reason for the credibility finding . . . that error was harmless, as substantial evidence still supports the ALJ's credibility determination notwithstanding the single errant rationale.").

## VI.  CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

1  Dated:     __October 5, 2018__                                    /s/ *Sheila K. Oberto*
2                                                    UNITED STATES MAGISTRATE JUDGE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28